**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 22-7154**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Cameroon Whiteru, *et al.*,

*Appellants,*

v.

Washington Metropolitan Area Transit Authority,

*Appellee.*

On appeal from the United States District Court
for the District of Columbia

**APPELLANTS' BRIEF**

Andrew D. Levy                          Louis G. Close, III
Andrew D. Freeman                    403 Central Avenue
Kobie A. Flowers                        Towson, Maryland 21204
Lauren A. DiMartino                  Telephone: (410) 296-3606
Michael R. Abrams
Brown, Goldstein & Levy, LLP
1300 Eye Street, NW
Washington, D.C. 20005
Telephone: (202) 742-5969

*Attorneys for Appellants*

March 17, 2023

## Certificate as to Parties, Rulings, and Related Cases

### Parties

Appellants (Plaintiffs below) are Cameroon Whiteru, individually and as personal representative of the Estate of Okiemute C. Whiteru, and Agnes Whiteru. Appellee (Defendant below) is the Washington Metropolitan Area Transit Authority.

### Rulings Under Review

The ruling under review is the district court's order of October 14, 2022 (Judge James E. Boasberg), JA 793, and accompanying memorandum opinion issued the same day, JA 794–807. The memorandum opinion is published at *Whiteru v. Washington Metropolitan Area Transit Authority*, No. 15-CV-0844 (JEB), 2022 WL 16569295 (D.D.C. Oct. 14, 2022).

### Related Cases

This case has previously been before this court. *Whiteru v. Washington Metropolitan Area Transit Authority*, No. 20-7087. This case was originally filed in the Superior Court of the District of Columbia under the name *Whiteru et ux. v. Washington Metropolitan Area Transit Authority*, Civil Action No. 2015 CA 003222 B. Counsel for Appellants are not aware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

# <u>TABLE OF CONTENTS</u>

Certificate as to Parties, Rulings, and Related Cases ................................ ii

TABLE OF AUTHORITIES ....................................................................... v

Jurisdictional Statement ............................................................................ 1

Statement of the Issues............................................................................. 1

Statement of the Case................................................................................ 2

    A.    Introduction ................................................................................. 2

    B.    Statement of Facts ...................................................................... 4

    C.    Procedural History...................................................................... 7

    D.    Legal Standard............................................................................ 9

Summary of Argument.............................................................................. 10

Argument................................................................................................... 12

I.    Because Mr. Whiteru remained a passenger in a special relationship with WMATA even after he accidentally fell behind the parapet wall, WMATA continued to owe him the common-carrier duty to aid................ 12

    A.    Under Restatement of Torts § 314A, a common carrier owes a duty to aid passengers injured on its premises—even in places ostensibly not held open to the public—when it knows or should know of their presence. ................................................................... 12

    B.    At all times, Mr. Whiteru remained a passenger in a special relationship with WMATA as his common carrier............................ 18

        i.    Mr. Whiteru was a paying customer, present at WMATA's invitation. ................................................................. 19

        ii.    Mr. Whiteru remained on WMATA's property at all relevant times. ........................................................................ 22

        iii.    Mr. Whiteru's fall from the platform was accidental. .............. 26

        iv.    Mr. Whiteru's presence behind the wall was foreseeable. .......28

II.    WMATA's duties to Mr. Whiteru did not instantly transform from the highest possible (the special relationship duties) to the lowest possible (the duty owed to a trespasser) when he fell behind the parapet wall..........32

    A.    Trespasser status does not categorically terminate a common carrier's affirmative duties. .................................................................32

    B.    Categorical application of a trespasser defense to this case contradicts history, public policy, and common sense and is inconsistent with developments in D.C. law......................................36

        1.    Developments in the law, along with public policy and common sense, all counsel against a categorical trespasser defense. ....................................................................36

        2.    D.C. precedent supports § 314A controlling this case over a categorical application of § 329. .............................................44

III.    In the alternative, even if the trespasser defense trumps the § 314A duty to aid, disputes of fact preclude summary judgment.....................................49

Conclusion .........................................................................................................51

Certificate of Compliance with Type-Volume Limit, Typeface ............................53

Requirements, and Type-Style Requirements ..........................................................53

# TABLE OF AUTHORITIES

## Cases

*Baker v. Fenneman & Brown Props., LLC*,
  793 N.E.2d 1203 (Ind. Ct. App. 2003) .................................................................16

*Birchall v. Cap. Transit Co*.,
  34 A.2d 624 (D.C. 1943) ............................................................. 38, 45

*Briggs v. WMATA*,
  481 F.3d 839 (D.C. Cir. 2007) ................................................... 25, 47

*Callaway v. Scrivner, Inc.*,
  No. CIV. A. 90C-AP1, 1991 WL 113437 (Del. Super. Ct. June 12, 1991).........15

*Cap. Traction Co. v. Copland*,
  47 App. D.C. 152 (D.C. Cir. 1917) ....................................... 38, 45, 48

*Chvala v. D.C. Transit Sys., Inc.*,
  306 F.2d 778 (D.C. Cir. 1962) ................................... 21, 22, 24, 25, 45

*Cont'l S. Lines, Inc. v. Robertson*,
  133 So. 2d 543 (1961) ............................................................. 15, 34

*Copeland v. Baltimore & Ohio Railroad Company*,
  416 A.2d 1 (D.C. 1980) ................................................. 29, 31, 32, 46

*Coulston v. WMATA*,
  No. 19-2060, 2020 WL 1236563 (D.D.C. Mar. 13, 2020)........................... 34, 48

*Daisey v. Colonial Parking, Inc.*,
  331 F.2d 777 (D.C. Cir. 1963) ............................... 26, 28–29, 31, 33, 45

*Dixon v. Great Falls & O.D. Ry. Co.*,
  38 App. D.C. 591 (D.C. Cir. 1912) ......................................................38

*Firfer v. United States*,
  208 F.2d 524 (D.C. Cir. 1953) ................................................. 21, 41, 42

*Foshee v. Consol. Rail Corp.*,
  661 F. Supp. 350 (D.D.C. 1987) ........................................................42

*Frederick v. Phila. Rapid Transit Co.*,
  10 A.2d 576 (Pa. 1940).......................................................... 15, 27, 42, 43

*Gould v. DeBeve*,
  330 F.2d 826 (D.C. Cir. 1964) ................................... 20, 21, 22, 31, 33

*Hines v. WMATA*,
No. 21-cv-679, 2022 WL 392306 (D.D.C. Feb. 9, 2022) ........................... 8–9, 48

*Holland v. Balt. & Oh. R. Co.*,
431 A.2d 597 (D.C. 1981) ........................................................... 28, 30

*Johnson v. WMATA*,
764 F. Supp. 1568 (D.D.C. 1991) ................................................. 29, 31

*Kermarec v. Compagnie Generale Transatlantique*,
358 U.S. 625 (1959) .........................................................................39

*Lloyd v. S. S. Kresge Co.*,
270 N.W.2d 423 (Wis. Ct. App. 1978)..............................................19

*Luck v. Balt. & Oh. R. Co.*,
510 F.2d 663 (D.C. Cir. 1974) .............................................. 30, 31, 45

*McKethean v. WMATA*,
588 A.2d 708 (D.C. 1991)....................................................... 24, 46–47

*Missile Cab Ass'n v. Rogers*,
184 A.2d 845 (D.C. 1962) .................................................................38

*Novak v. Cap. Mgmt. & Dev. Corp.*,
452 F.3d 902 (D.C. Cir. 2006) ........................................................10

*Penn. Co. v. Roy*,
102 U.S. 451 (1880) .........................................................................19

*Pickard v. City & Cnty. of Honolulu*,
452 P.2d 445 (Haw. 1969)................................................................44

*Pistorio v. Wash. R. & E. Co.*,
46 App. D.C. 479 (D.C. Cir. 1917) ....................................................38

*Pridgen v. Boston Housing Authority*,
308 N.E.2d 467 (1974) ............................................................... 33, 44

*Rossi v. DelDuca*,
181 N.E.2d 591 (Mass. 1962)...........................................................40

*Satterfield v. Breeding Insulation Co.*,
266 S.W.3d 347 (Tenn. 2008) ..................................................... 36, 37

*Shelton v. Ky. Easter Seals Soc., Inc.*,
413 S.W.3d 901 (Ky. 2013) ..............................................................41

*Smith v. Arbaugh's Rest., Inc.*,
469 F.2d 97 (D.C. Cir. 1972) ...........................................................31

*Southland Corp v. Griffith*,
 633 A.2d 84 (Md. 1993) ................................................................. 13, 24

*Tobin v. Penn. R. Co.*,
 100 F.2d 435 (D.C. Cir. 1938) ..................................................... 30, 45

*Trisuzzi v. Tabatchnik*,
 666 A.2d 543 (N.J. App. Div. 1995) ...................................................50

*Webster v. Cap. Transit Co.*,
 200 F.2d 134 (1952) ...........................................................................24

*Whitaker v. WMATA*,
 1984 U.S. Dist. LEXIS 16712 (D.D.C. May 14, 1984) ......................... 16, 48, 50

*Whiteru et ux. v. Washington Metropolitan Area Transit Authority*,
 Civil Action No. 2015 CA 003222 B ..................................................... ii

*Whiteru v. WMATA*,
 1:15-cv-00844-KBJ, ECF No. 71-1 (D.D.C. Sept. 29, 2018) ................8

*Whiteru v. WMATA*,
 25 F.4th 1053 (2022) .......................................... 3, 4, 9, 10, 11, 12, 13, 33, 35, 36

*Whiteru v. WMATA*,
 258 F. Supp. 3d 175 (D.D.C. 2017) ..................................................... 7, 13, 33, 42

*Whiteru v. WMATA*,
 No. 20-7087, ECF No. 1891917 (D.C. Cir. Mar. 26, 2021) ................................35

*Winfrey v. GGP Ala Moana LLC*,
 308 P.3d 891 (Haw. 2013)............................................. 13, 14, 15, 16, 23, 34, 44

*WMATA v. Jeanty*,
 718 A.2d 172 (D.C. 1998) ...................................................... 13, 40, 47

*WMATA v. O'Neill*,
 633 A.2d 834 (D.C. 1993) ...................................................................47

*WMATA v. Ward*,
 433 A.2d 1072 (D.C. App. 1981) ................................................. 46, 50

*Yazoo & M.V.R. Co. v. Byrd*,
 42 So. 286 (Miss. 1906) ................................................... 17, 18, 42, 43

**Rules**

D.C. Rule 28(g) ...................................................................................48

Fed. R. Civ. P. 56(a)...............................................................................9

Fed. R. Civ. P. 6(b)(1)(B) ...........................................................................7

**Statutes**

28 U.S.C. § 1291 ........................................................................................1

**Other Authorities**

Dan B. Dobbs *et al.*, *Dobbs' Law of Torts*
  § 117 (July 2022 Update) ................................................... 26, 40

Ernest J. Weinrib, *The Case for a Duty to Rescue*,
  90 Y.L.J. 247 (1980)...............................................................40

Harold F. McNiece & John V. Thornton, *Affirmative Duties in Tort*,
  58 Yale L.J. 1272 (1949)................................................. 20, 37, 39

James A. Henderson, Jr., *The Status of Trespassers on Land*,
  44 Wake Forest L. Rev. 1071, 1076 (2009) ................................. 39, 40

Leff Smith & Phuong Ly, *New Service Puts Metro on the Party Line*,
  WASH. POST (Nov. 8, 1999), https://www.washingtonpost.com/wp-
  srv/WPcap/1999-11/08/026r-110899-idx.html?itid=lk_inline_manual_26........20

Michael L. Rustad & Thomas H. Koenig, *Taming the Tort Monster*,
  68 Brook. L. Rev. 1 (2002).........................................................43

Restatement (Second) of Torts § 314A...................................... 3, 12, 13, 23, 27, 43

Restatement (Second) of Torts § 329 ...................... 9, 27, 32, 37, 42, 43, 44, 48, 51

Restatement (Third) of Torts, § 52 .........................................................41

Warren A. Seavey, Comment, *I Am Not My Guest's Keeper*,
  13 Vanderbilt L. Rev. 699 (1960) .......................................................18

WMATA Compact art. XVI, § 80 ........................................................10

**Jurisdictional Statement**

The district court had jurisdiction pursuant to the Washington Metropolitan Area Transit Authority ("WMATA") Compact, art. XVI, § 81; D.C. Code § 9 1107.01(81), which established original and concurrent jurisdiction in the United States District Court for the District of Columbia over matters involving WMATA. *See* WMATA Compact. This Court has jurisdiction under 28 U.S.C. § 1291 because this appeal is from the district court's grant of summary judgment to WMATA on October 14, 2022, which disposed of all parties' claims. Appellants timely filed their Notice of Appeal on November 3, 2022.

**Statement of the Issues**

Okiemute Whiteru was a paid passenger on the DC Metro to whom WMATA, as a common carrier, owed a heightened duty of care. Mr. Whiteru inadvertently fell over a low wall in a subway station, rendering him in need of aid. A jury could reasonably find that WMATA knew or should have known that Mr. Whiteru had fallen and needed aid.

1.     Did the fact that Mr. Whiteru accidentally fell from a place he was allowed to be to a place WMATA maintains he was not allowed change his relationship to WMATA and the duty it owed him to render aid when it should have known of his injury on its premises?

2.      As a common carrier, WMATA owed its passenger, Mr. Whiteru, the highest duties known to tort law. Did Mr. Whiteru's accidental fall over a low wall instantly transform him to a mere trespasser to whom WMATA owed the lowest duty known to the law?

3.      Are there disputes of fact as to whether Mr. Whiteru became a trespasser when he involuntarily fell into an area that was neither posted as off-limits nor adequately secured and as to whether WMATA should have known of his presence?

**Statement of the Case**

**A. Introduction**

This is an appeal from the district court's grant of WMATA's fourth dispositive motion. The court held that by falling accidentally into an area WMATA claims was off-limits to him (though it was not marked as such), Okiemute Whiteru—a paid passenger in a "special relationship" with WMATA and to whom WMATA owed a heightened duty of care—was rendered a mere trespasser to whom WMATA owed no duty to render aid.

Late one night in October 2013, having paid the required fare, Mr. Whiteru arrived at the Judiciary Square Metro Station operated by WMATA. Once there, while waiting for a train, Mr. Whiteru fell backwards over a three-foot parapet wall separating the subway platform from the station wall. He lay there, partially

paralyzed and calling for help, for three or four hours before dying from a worsening of his original injuries. National standards and WMATA's own policies required the station manager to walk the length of the platform and look into areas where people or objects can be concealed. Had she done so, the station manager would have discovered Mr. Whiteru, and he would have fully recovered. Because she ignored those duties, he died a slow and painful death.

This is the second time this case has been before this Court. *See Whiteru v. WMATA* (*Whiteru I*), 25 F.4th 1053 (2022). Last year, the Court held that the contributory negligence bar against recovery for Mr. Whiteru's *initial* injuries did not excuse WMATA's *subsequent* failure to render aid. Rather, a reasonable jury could find that WMATA's actions violated the duties of a common carrier under § 314A of the Restatement (Second) of Torts to properly inspect its premises and to render aid to a passenger it knows, or should know, requires assistance.

After this Court ruled, and just three-and-a-half months before the scheduled trial, WMATA filed its "second supplemental" (that is, third) motion for summary judgment. WMATA argued that by accidentally falling backwards over the parapet wall, Mr. Whiteru lost his status as a passenger, such that its only duty to him was the minimal duty owed to a trespasser. The district court granted that motion.

This was error. WMATA invited Mr. Whiteru, a paid passenger, into an economically beneficial relationship. After Mr. Whiteru fell behind the wall, he

3

died from a worsening of his original injuries because WMATA failed to perform its mandatory inspections. Since Mr. Whiteru always remained a passenger, his fall behind the wall did not excuse WMATA of its common carrier duties. After all, tort law is intended to incentivize desirable behavior, such as a common carrier rescuing its injured passengers from areas where their presence is foreseeable rather than leaving them to die. To that end, the categorical tripartite distinction among invitees, licensees, and trespassers has increasingly been replaced by a more-nuanced evaluation of the parties' relationship. Here, the D.C. Court of Appeals would hold that Mr. Whiteru remained a passenger and WMATA's trespasser defense is inapplicable.

## B. Statement of Facts

Many of the facts are set forth in this Court's 2022 opinion, *Whiteru I*, 25 F.4th at 1055–57. The following is a more thorough summary of the record.

Shortly after midnight on October 19, 2013, 35-year-old attorney Okiemute Whiteru paid his fare and entered WMATA's Metro subway system. JA 54. Mr. Whiteru was intoxicated, JA 689, 693, as are many passengers whom WMATA encourages to ride rather than drive, *see infra* at 24–25. He rode the Red Line from the Farragut North Metro Station to the Judiciary Square Metro Station. JA 54. Once there, he ascended to the mezzanine level, approached the station manager's kiosk, and spoke with Rhonda Brown, the station manager. JA 54–55. Ms. Brown

4

helped Mr. Whiteru process his SmarTrip card. JA 55. Mr. Whiteru returned to the

Metro platform via an escalator that was not working. JA 55. He stumbled the last

few steps and fell to the station platform at the base of the escalator, where he lay

for approximately three-and-a-half minutes. JA 55.

Mr. Whiteru regained his footing and leaned against the 35-inch-high

parapet wall at the edge of the platform, adjacent to the bottom of the escalator. JA

56. At approximately 1:15 a.m., Mr. Whiteru fell backwards over the parapet wall,

landing in the gap between the platform and the station wall. JA 57–58.

As a direct result of the fall, Mr. Whiteru suffered a fracture of his C-5

vertebrae. JA 29, 57. The spinal fracture partially paralyzed Mr. Whiteru,

preventing him from extricating himself. JA 31. The fracture also compromised

Mr. Whiteru's breathing. JA 31–32. The Whiterus' medical experts concluded that:

(1) Mr. Whiteru remained conscious after the fall for the next three-to-four hours

and suffered no brain injury; (2) during this period, Mr. Whiteru was able to call

out for help; (3) as time went by, the spinal fracture caused increasing loss of

function in the phrenic nerve, which controls the diaphragm muscles; and (4) Mr.

Whiteru died a slow and painful death from asphyxia as a result. JA 28–32; JA 33–

35, 692–705.

WMATA's standard operating procedures and the national standard of care

each required the station manager, Ms. Brown, to inspect the mezzanine and

platform areas every hour and at closing time. JA 58–59, 465. Station managers were required to "walk[] the station platform from end gate to end gate" and "[p]ay special attention to areas of the station where confused customers or customers with diminished capacity might sleep." JA 59. Ms. Brown has no memory of performing the required walk-through inspections at 1:30 a.m., 2:30 a.m., or at the station's 3:15 a.m. closing. JA 63–64. Although WMATA preserved video showing Mr. Whiteru's fall, it did not preserve any video evidence from after the fall, including any evidence that Ms. Brown performed the required walk-throughs. JA 65–66.

The Whiterus' experts, Carl Berkowitz and Duane Martin, opined that the national standard of care required Ms. Brown to look behind the parapet wall "for people, packages or other objects in that area." JA 467; *see* JA 506–07. Mr. Whiteru was visible while stuck behind the wall and would have been discovered had Ms. Brown performed such an inspection. *See* JA 57, 66–67, 507. Because Mr. Whiteru was conscious and able to call for help, JA 703–704, Ms. Brown would also have heard him had she walked the largely deserted platform. Had Mr. Whiteru been discovered at any of the required platform inspections between his fall around 1:15 a.m. and the station closing at 3:15 a.m., he would have received medical assistance, survived, and made a full neurological and physical recovery. JA 34, 68.

### C. Procedural History

Mr. Whiteru's parents, Cameroon and Agnes Whiteru, and his estate

(collectively, "the Whiterus") brought suit to recover for the injuries WMATA

inflicted on Mr. Whiteru by leaving him alone in its station, helpless and dying, for

hours after it should have discovered him and sought aid. In May 2015, the

Whiterus filed a complaint in the Superior Court of the District of Columbia,

contending that Ms. Brown was negligent in failing to perform reasonable

inspections as required by WMATA's policies and the applicable standard of care.

JA 1. WMATA removed the suit to the United States District Court for the District

of Columbia in June 2015. JA 3. The district court granted in part and denied in

part WMATA's motion to dismiss in November 2015. JA 4. The Whiterus filed an

amended complaint in January 2016. JA 5.

WMATA filed its first motion for summary judgment in July 2016, arguing

sovereign immunity and failure to establish duty and breach. The district court

(Brown-Jackson, J.) denied that motion in July 2017. *Whiteru v. WMATA*, 258 F.

Supp. 3d 175, 193 (D.D.C. 2017).

In September 2018, WMATA sought leave under Fed. R. Civ. P. 6(b)(1)(B)

"to file an out-of-time Motion for Summary Judgment" to argue contributory

negligence, explaining that it failed to raise the issue in its first motion "because of

excusable neglect." Def.'s Mem. Supp. Mot. for Leave, *Whiteru v. WMATA*, 1:15-

7

cv-00844-KBJ, ECF No. 71-1 at 2–3 (D.D.C. Sept. 29, 2018). It had since hired

new counsel who "needed to review the case file in this case, a case which has

been ongoing for over three years," which "required reviewing voluminous records

to familiarize themselves with the case," and who then "determined . . . that the

issue of contributory negligence should have been raised" in the first motion. *Id.*

(seeking leave "to correct this oversight by WMATA's prior counsel"). The district

court granted WMATA's motion for leave in December 2018. The district court

subsequently granted WMATA's first supplemental motion for summary judgment

on contributory negligence grounds in August 2020. JA 743.

Mr. Whiteru appealed to this Court, which reversed in February 2022 and

remanded in April 2022. Judge Brown-Jackson had been elevated to this Court, so

the case was reassigned. After holding a status conference, the district court set

trial for November 2022.

In July 2022, presenting to a new decisionmaker, WMATA again moved

under Rule 6(b)(1)(B) for leave to file an out-of-time, successive summary

judgment motion. Def.'s Mem. Supp. Mot. for Leave, *Whiteru v. WMATA*, 1:15-

cv-00844-JEB, ECF No. 100 at 3–8 (D.D.C. July 1, 2022). WMATA again raised a

new argument—the trespass defense at issue in this appeal—by citing its hiring of

yet another new counsel. *Id.* WMATA also pointed to purportedly new law giving

rise to the trespass argument, *id.* (citing *Hines v. WMATA*, No. 21-cv-679, 2022

8

WL 392306, at *5 (D.D.C. Feb. 9, 2022) ("*Hines I*")), despite WMATA previously raising trespass in this case and despite WMATA itself being the prevailing party in the case that supposedly gave rise to its new argument.

On August 2, 2022, the district court granted WMATA leave to file its third summary judgment motion, after remand and over six years after WMATA's first dispositive motion. WMATA argued that because Mr. Whiteru fell into a location where passengers were not permitted, he should be deemed a trespasser. *See* Restatement (Second) of Torts § 329 (defining a trespasser as a person who "enters or remains upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise"). The district court granted summary judgment to WMATA in October 2022, JA 793, dismissing the case just one month before trial, more than seven years after the Whiterus filed their complaint, and days before the ninth anniversary of Mr. Whiteru's untimely death.

### D. Legal Standard

This Court reviews grants of summary judgment *de novo*, viewing the facts and drawing all inferences in the light most favorable to the non-moving party. *Whiteru I*, 25 F.4th at 1057 (citation omitted). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

9

This case is governed by the law of the District of Columbia. WMATA Compact art. XVI, § 80 ("The Authority shall be liable for its contracts and for its torts . . . in accordance with the law of the applicable Signatory . . . ."). In such circumstances, this Court has observed that it attempts "to achieve the same outcome we believe would result if the District of Columbia Court of Appeals considered this case." *Novak v. Cap. Mgmt. & Dev. Corp.*, 452 F.3d 902, 907 (D.C. Cir. 2006).

## Summary of Argument

As a common carrier, WMATA has a "special relationship" with members of the public it invites onto its property. Restatement (Second) of Torts § 314A(b). This relationship creates an affirmative duty for WMATA to aid passengers if it knows or has reason to know that they are ill or injured on its property. *Whiteru I*, 25 F.4th at 1058. This special relationship continues even when the passenger's original injury resulted from contributory negligence, *see id.* at 1059; likewise, it is not surrendered by a passenger accidentally falling backwards over a wall instead of forward onto a platform. When a paying passenger is invited onto a common carrier's property and accidentally falls into a space controlled by the common carrier, which the carrier had a duty to inspect, the common carrier remains obligated to render aid to that passenger.

The district court erred by treating alleged trespasser status as a categorical bar to recovery. It applied § 329 with too broad a brush and ignored the still-applicable common-carrier doctrine. The history of the common-carrier and trespasser standards and the evolution of those standards in D.C. law show that WMATA's duty to Mr. Whiteru did not transform from the highest standard in tort law to the lowest because of where he landed when he fell. Only when the common carrier has no reason to know of the injured passenger's presence is it relieved of the duty to aid him.

Last year, this Court held that "a reasonable jury could conclude that [WMATA station manager] Rhonda Brown failed to perform the routine inspections, or performed them unreasonably." *Whiteru I*, 25 F.4th at 1059. "Under those circumstances, WMATA could be liable for failing to aid Mr. Whiteru because it knew or had reason to know that he was injured." *Id*. WMATA's trespasser argument—raised in its third attempt at summary judgment—does not absolve it of this responsibility, nor does it undermine this Court's previous determination that there are genuine disputes of material fact here.

### Argument

**I. Because Mr. Whiteru remained a passenger in a special relationship with WMATA even after he accidentally fell behind the parapet wall, WMATA continued to owe him the common-carrier duty to aid.**

As a common carrier, WMATA owes a duty to aid injured passengers on its premises when it knows, or should know, of their presence. Here, Mr. Whiteru remained a passenger even though he fell behind the wall of the Metro passenger platform: he was a paying customer; he remained on WMATA's property; he fell accidentally; and the location where he lay injured was both foreseeable and in a place the station manager had a duty to inspect. Therefore, WMATA owed a duty to help him, regardless of whether the area he fell into was open to passengers.

**A.    Under Restatement of Torts § 314A, a common carrier owes a duty to aid passengers injured on its premises—even in places ostensibly not held open to the public—when it knows or should know of their presence.**

Restatement of Torts § 314A identifies several special relationships that give rise to heightened tort duties, including the relationship between a "common carrier" and "its passengers," Restatement (Second) of Torts § 314A(1), and "a possessor of land who holds it open to the public" and those "who enter in response to his invitation," *id.* § 314A(3). These relationships impose on the carrier a duty to inspect its premises. *See, e.g.*, *Whiteru I*, 25 F.4th at 1058–59. Complementing that duty to inspect, the carrier owes "a duty to its passengers to take reasonable action" to render aid "after it knows or has reason to know" that a

12

passenger is injured. Restatement (Second) of Torts § 314A; *Whiteru I*, 25 F.4th at 1058–60.

Section 314A has been "explicitly adopted" by D.C. courts and applies to this case. *See Whiteru I*, 25 F.4th at 1058. Application of this special relationship doctrine, then, "take[s] the case *out of the general rule*." Restatement (Second) of Torts § 314A, cmt. b (emphasis added).[1] Therefore, factors that may be dispositive under the "general rule" of tort are not controlling in this analysis. *See WMATA v. Jeanty*, 718 A.2d 172, 175 (D.C. 1998) ("[A]ll of the [common carrier decisions in D.C.] recognize that the standard is always contextual, and that the carrier's relation to, and duties toward, its passengers constitute the critical context in which the carrier's conduct is evaluated.").

Rather, the controlling threshold question here is whether Mr. Whiteru and WMATA were in a special relationship under § 314A when he needed aid. For a proper example of this approach, consider *Winfrey v. GGP Ala Moana LLC*, 308 P.3d 891 (Haw. 2013). There, an invitee wandered onto the roof of a shopping mall, where she became trapped and died in an exhaust hood above the food court.

---

[1] *See, e.g.*, *Whiteru I*, 25 F.4th at 1059 ("The common law of the District allows for some exceptions to the strict application of contributory negligence . . . . Common carrier liability pursuant to Section 314A of the Restatement is another such exception."); *Southland Corp. v. Griffith*, 633 A.2d 84, 90 (Md. 1993) ("[A] person has no legal duty to come to the aid of another in distress" except for instances "of a legally cognizable special relationship" that may provide the basis for "exceptions to this general common law rule.").

*Id.* at 894–97. Like here, the defendant argued that the decedent was in a place she was not permitted and that it owed no duty to aid such trespassers. *Id.* at 898. But the court rejected this categorical application of the general rule, explaining that the special relationship doctrine required a different analysis: "[A]lthough [the decedent] was found in a restricted area of the Center, [defendant] was not absolved from its duty to aid if [decedent] entered the Center in response to [defendant's] invitation to the public and subsequently became injured or ill on the property." *Id.* at 903–05. Considering § 314A and the special "relationship between the owner of a shopping center and members of the public who enter the property pursuant to an invitation," there were compelling reasons to impose a duty on the shopping mall:

> It is not difficult to imagine situations in which a member of the public, invited to a shopping center, becomes ill or injured in an area not otherwise open to the public. For example, a . . . . patron could, while having a heart attack, stagger into a restricted area. The law should not automatically absolve a shopping center owner from taking reasonable action to aid possible or actual customers based on entry into restricted areas.

*Id.* In other words, an individual who might otherwise be considered a trespasser under the general rule remains entitled to protection because the special relationship between a business and its customers (or a common carrier and its passengers) imposes heightened obligations on the property holder. *See id.*

14

*Winfrey* should not be considered an outlier. Courts have long held that common carriers owe a duty to help injured people on their premises once they know or should know of their plight. For example, when the Pennsylvania Supreme Court addressed the duty owed to a plaintiff who fell onto the train tracks, it acknowledged that he "was not invited, and his appearance was not to be anticipated," so "the extent of defendant's obligation toward him was no greater than if he were a trespasser." *Frederick v. Phila. Rapid Transit Co.*, 10 A.2d 576, 578 (Pa. 1940). Nonetheless, "when the owner or operator is put on guard as to the presence of the trespasser, the latter immediately acquires the right to proper protection under the circumstances." *Id.* Similarly, in Mississippi, the duty of a carrier to aid an injured passenger can extend until the passenger has reached his destination—even after the passenger has disembarked—if the carrier knows of the passenger's peril. *Cont'l S. Lines, Inc. v. Robertson*, 133 So. 2d 543, 545 (1961) ("When the carrier knows of the helpless or practically helpless condition of the passenger at the end of the journey, and that the necessity of medical aid is urgent, it would none the less fail in its obligation when it simply leaves him lying there, than if it had done the like enroute.") (citation omitted); *see also Callaway v. Scrivner, Inc.*, No. CIV. A. 90C-AP1, 1991 WL 113437, at \*3 (Del. Super. Ct. June 12, 1991) (holding under § 314A that special relationships impose a duty on the property-holder to render aid "after it knew or had reason to know that plaintiff

15

was injured and to care for plaintiff until she could be cared for by others"). Even

in *Whitaker v. WMATA*, an unpublished opinion on which WMATA heavily relies,

the court stated that if WMATA were to have discovered the trespasser on its

tracks, at that point its duty to render aid would have been heightened. 1984 U.S.

Dist. LEXIS 16712, *26 (D.D.C. May 14, 1984). WMATA does not dispute that it

must render aid when its agent knows a person on its premises is in peril. Any

other conclusion is unreasonable. *Cf. Baker v. Fenneman & Brown Props., LLC*,

793 N.E.2d 1203, 1210 (Ind. Ct. App. 2003) ("[A]s a practical matter, . . . we find

it unlikely customers would patronize a business that left another customer who

was ill or injured lying on the floor of the business simply because the business

was not responsible for the customer's illness or injury.").

An illustration in § 314A confirms the rule of these cases:

> A, a passenger on the train of B Railroad, negligently falls off of the
> train, and is injured. The train crew discover that he has fallen off, but
> do nothing to send aid to him, or to notify others to do so. A lies
> unconscious by the side of the track in a cold rain for several hours, as
> a result of which his original injuries are seriously aggravated. B
> Railroad is subject to liability to A for the aggravation of his injuries.

§ 314A cmt. d, illus. 1. That illustration mirrors this case, and, as in *Winfrey* and

the other cases cited above, the ostensible trespasser status of "A" when lying by

the side of the track is irrelevant to the duty owed by "B Railroad," given its

knowledge of A's peril.

16

The illustration is based on a Mississippi case, *Yazoo & M.V.R. Co. v. Byrd*, 42 So. 286 (Miss. 1906). In *Yazoo*, the plaintiff was intoxicated on an overcrowded train; while attempting to navigate the edge of the moving train car, he fell off, landing on the side of the tracks. 42 So. at 287. Despite the conductor's awareness of the passenger's need for help, the passenger was left on the ground for over three hours, causing his death. *Id.* Even though the plaintiff fell where passengers were typically not permitted, the court held the common carrier liable:

> Railroads owe to their passengers the consideration and care of common humanity. It matters not how negligent a passenger may have been in producing the injury for which he sues, it does not absolve the railroad from the duty which it owes to him of proper attention after an accident shall have occurred, and if, when injured, the railroad company neglects this care, which common humanity would dictate, and by reason of this neglect, after the injury has occurred, a passenger suffers damage, he may recover against the railroad company for its dereliction.

*Id.* at 288.

The district court dismissed the illustration and the holding of the case on which it is based because "it did not in fact concern the question of trespass." JA 803–04. But that is exactly the point: *Yazoo* was silent on trespasser status (even though the plaintiff surely was not allowed beside the tracks where he fell) because that status was irrelevant to the duty the common carrier owed its passenger. So understood, *Yazoo*'s silence on trespasser-status is instructive, not distinguishing.

17

The district court also found that subsequent gloss on *Yazoo* undermines the rule for which Appellants cite it. Not so. For example, Warren A. Seavey—storied Harvard Law professor and a reporter for the Restatement of Torts—cited *Yazoo*, over fifty years after its reporting, for the simple proposition that "a carrier aware that a passenger is ill cannot leave him to die." Warren A. Seavey, Comment, *I Am Not My Guest's Keeper*, 13 Vanderbilt L. Rev. 699, 701 & n.17 (1960) (citation omitted). Although *Yazoo* discussed the carrier's negligence contributing to the passenger's injury, that did not change its fundamental rule: a common carrier owes a duty to aid passengers it knows are injured—regardless of where they happen to fall.

In sum, because of the special relationship between common carriers and their passengers, the carrier must aid passengers it knows are injured. Accordingly, the controlling question here is whether Mr. Whiteru remained a passenger after he accidentally fell behind the wall on WMATA's passenger platform. For the following reasons, the answer is yes.

### B. At all times, Mr. Whiteru remained a passenger in a special relationship with WMATA as his common carrier.

Mr. Whiteru was still a passenger in a special relationship with WMATA after he fell behind the wall. Because Mr. Whiteru was a paying customer, was on WMATA's property, fell accidentally, and was in a foreseeable location, he remained a passenger to whom WMATA owed a duty to aid.

18

### i.    Mr. Whiteru was a paying customer, present at WMATA's invitation.

First and foremost, Mr. Whiteru remained a passenger in a special relationship with WMATA while in need of aid because he paid his fare to ride the Metro. He was waiting for a train on WMATA's passenger platform when he fell. Had he miraculously recovered and climbed from behind the wall, Mr. Whiteru could have boarded the next train as a paid passenger.

Because WMATA benefits economically from inviting passengers onto its premises, it must also bear the associated risks of doing so. *Cf. Penn. Co. v. Roy*, 102 U.S. 451, 457–58 (1880) ("The law will not permit a railroad company, engaged in the business of carrying persons for hire . . . to evade the duty of providing proper means for the safe conveyance of those whom it has agreed to convey."). "Social policy dictates that [one] who is deriving this economic benefit from the presence of the customer[] should assume the affirmative duty stated in Sec[tion] 314A." *Lloyd v. S. S. Kresge Co.*, 270 N.W.2d 423, 426 (Wis. Ct. App. 1978) ("It is a cost of doing business."). In particular, WMATA has sought out business from intoxicated riders by presenting itself as a safer alternative to driving.[2] By seeking that financial benefit, WMATA takes on the associated risks,

---

[2] WMATA first introduced extended evening hours specifically to win business from the intoxicated. *See* Fredrick Kunkle, *Party's Over: Metro's massive rebuilding will put crimp on nightlife*, WASH. POST (May 6, 2016, 8:09 p.m.), https://www.washingtonpost.com/news/tripping/wp/2016/05/06/partys-over-

which the law apportions through the § 314A affirmative duties. This is consistent with the rule that affirmative duties are imposed in relationships "where the one under a duty to act has voluntarily brought himself into a certain relationship with others from which he obtains or expects benefits." Harold F. McNiece & John V. Thornton, *Affirmative Duties in Tort*, 58 Yale L.J. 1272, 1282–83 (1949).

This principle is well-established in premises liability. In such cases, this Court has long considered whether the landowner offers his land for some profitable purpose to the class of persons in which the plaintiff falls. *See, e.g., Gould v. DeBeve*, 330 F.2d 826, 830 (D.C. Cir. 1964). In *Gould*, a child who was in a rented house without permission under the terms of the lease fell through a defective window screen and was injured. *Id.* The landlord argued that the boy was a trespasser. *Id.* The court agreed that defining the boy as a trespasser was "technically accurate," but noted that "the concept of trespass, like other legal abstractions, casts its net very widely indeed, and that meaningful classification for particular purposes can only begin after the catch and not before." *Id.* at 829.

---

metros-massive-rebuilding-will-put-crimp-on-nightlife/ ("Metro first experimented with after-midnight service in November 1999 to allow people to linger after dinner and juice the city's bar-hopping scene."); Leff Smith & Phuong Ly, *New Service Puts Metro on the Party Line*, WASH. POST (Nov. 8, 1999), https://www.washingtonpost.com/wp-srv/WPcap/1999-11/08/026r-110899-idx.html?itid=lk_inline_manual_26 (explaining that the campaign to expand Metro service hours was supported by "bar patrons and Mothers Against Drunk Driving," and anticipating that Metro riders would drink more as a result).

Because the defendants "were in the business of owning and operating rental housing . . . they were obligated to provide and maintain decent and safe quarters where ordinary life might go on." *Id.* (stating that although a jury could conclude that the mother could have left the window closed knowing the screen was defective, one must also anticipate ordinary-life situations such as a "Washington summer when windows must be raised")*.* The court found that the issue of whether the landlord "fail[ed] to perform an act with knowledge that non-performance of that act was likely to result in injury" was properly an issue for the jury—and "d[id] not think calling him a trespasser dictate[d] a different result." *Id.* at 830 ("To hold otherwise would be to ignore reality in favor of technicality in administering justice.").

Even WMATA's authorities reflect this consideration. For example, in *Firfer v. United States*—relied upon by both WMATA and the district court—the plaintiff was injured while trespassing on the Jefferson Memorial site. 208 F.2d 524, 526 (D.C. Cir. 1953). In holding that the property holder did not owe the plaintiff a duty, the dispositive factor was the absence of any "intention to carry on some commercial transaction." *Id.* at 527. By contrast, in cases involving WMATA, this Court has long acknowledged that WMATA's obligations are shaped by its commercial purpose. *See, e.g.*, *Chvala v. D.C. Transit Sys., Inc.*, 306 F.2d 778, 781 (D.C. Cir. 1962). In *Chvala*, the Court emphasized that WMATA's

21

facilities "have been constructed at public expense for the safety and convenience of [its] customers." *Id.* "By the same token they are facilities for the special convenience and benefit of [WMATA], which holds an exclusive franchise for the transportation of the persons boarding and alighting from [WMATA] with the aid of these facilities." *Id.* Accordingly, WMATA owes affirmative duties to its paying passengers under § 314A.

Mr. Whiteru was one of those paying passengers. He paid his fare and was waiting for a train on the platform intended for passengers like him. He fell behind the short wall that sits on that platform to lean against. He was distinct from a person present in the station without paying—such as those who hop the turnstile or choose to remain outside of operating hours—who would not be in a special relationship with WMATA as common carrier. Because WMATA "puts [its] land to profitable use" and "invit[es] significant numbers of people" like Mr. Whiteru to its stations, WMATA "inevitably takes on an aspect different from the country squire who wants mainly to be left alone on his rural acres." *Gould*, 330 F.2d at 830. Here, because Mr. Whiteru was a paying passenger, WMATA remained in a special relationship with him when he was injured.

### ii.    Mr. Whiteru remained on WMATA's property at all relevant times.

Furthermore, Mr. Whiteru was still in a special relationship with WMATA while in need of aid because he remained in WMATA's station. In special

relationship cases under § 314A, the focus is on the *entire* premises. Common carriers are responsible for providing aid to passengers foreseeably injured on their grounds, regardless of whether they were in places they should or should not be. *See Winfrey*, 308 P.3d at 904 (listing examples of situations, which are "not difficult to imagine," in which customers could end up injured in the "restricted areas" of a business site). The duty flows from the common carrier's constructive knowledge of the injured passenger's plight, not the permissibility of the passenger's locale.

The § 314A illustrations exemplify this consideration. For example, in Illustration 1, Comment D, discussed above, the carrier remained liable for failing to aid a passenger who fell off a train onto the side of the tracks. The carrier was liable because it knew the passenger had fallen there, even though it was a restricted area. By contrast, in Comment C, the Restatement provides that the special relationship is terminated by a rider who "has *left* the vehicle and *ceased to be a passenger*," or the guest of an innkeeper who "is *away from the premises*." Restatement (Second) of Torts § 314A, cmt. c (emphases added). The existence of an ongoing relationship is the principal determinant of the duty owed, and presence on the premises is a strong indication of an ongoing relationship. If the relationship continues and the property holder has constructive knowledge of the injury, then the permissibility of the location where the passenger or customer lies injured is

insignificant, even though it might be dispositive under the general rule in the absence of the relationship. *See, e.g., Chvala*, 306 F.2d at 781 (considering whether the plaintiff was located on WMATA's property); *Southland Corp. v. Griffith*, 633 A.2d 84, 90 (Md. 1993) ("[A] shopkeeper owes a legal duty to render aid to an invitee when the shopkeeper knows that the invitee is ill or injured on the business premises.").

*McKethean v. WMATA*, 588 A.2d 708 (D.C. 1991), is instructive. The district court cited *McKethean* to support its categorical treatment of Mr. Whiteru as a "non-passenger." JA 800, 806. But the case cuts in the other direction: several people were injured by a passing car while waiting for a WMATA bus; they had not paid WMATA any fare, and they were not injured on WMATA's property. *McKethean*, 588 A.2d at 710–11. "Rather, they were all waiting on the sidewalk, which was owned not by WMATA but by the District of Columbia." *Id.* at 712. These *prospective* passengers were not yet in a special relationship with WMATA, but this Court acknowledged that a duty may arise "if the *property upon which an individual stands when injured* is either owned by or under the control of the carrier." *Id.* (emphasis added). Emphasizing the point, the Court compared a case where the "carrier had 'no obligation growing out of ownership or control' because the platform where plaintiff was injured was neither its property nor under its control," *id.* (quoting *Webster v. Cap. Transit Co.*, 200 F.2d 134, 135 (1952)), with

24

*Chvala*, 306 F.2d 778, where the Court held the carrier liable for injuries on a streetcar loading platform over which it exercised control, *id.* (holding the carrier liable because it "had statutory duty to 'maintain, mark, and light'" the platform). Similarly, in *Briggs v. WMATA*, the plaintiff was injured *before* he entered the train station, so he had not yet "placed himself in some substantial sense in the custody or under the control of [WMATA]." 481 F.3d 839, 845 (D.C. Cir. 2007). It follows that once he had "placed himself" on WMATA's property and under its care, the special relationship would impose heightened obligations on WMATA. *See id.*

Mr. Whiteru was present on WMATA's premises, having placed himself in the custody of WMATA as his common carrier. He was more than a *prospective* passenger: he had paid a fare, ridden the subway, and was in need of aid on property wholly owned and controlled by WMATA. As noted above, WMATA's own station-closing procedures reflect its understanding of its responsibility to inspect all areas of the station where people or hidden objects could be found, including ostensibly restricted areas even after the station has closed. Mr. Whiteru's presence on WMATA's premises, having fallen from the platform designed for waiting passengers, supports that Mr. Whiteru remained in a special relationship with WMATA under § 314A.

### iii.    Mr. Whiteru's fall from the platform was accidental.

Next, Mr. Whiteru fell *accidentally* behind the wall on the passenger platform. The accidental nature of the fall, from a location specifically designed for Mr. Whiteru to wait, indicates that the fall did not instantly terminate the special relationship. That is a crucial distinction from trespassers on WMATA's premises who voluntarily enter without paying or when the station is closed. "Courts have long recognized . . . that there may be circumstances in which [trespasser] assumptions do not apply." *See Daisey v. Colonial Parking, Inc.*, 331 F.2d 777, 778 (D.C. Cir. 1963); *see, e.g.*, Dan B. Dobbs *et al.*, *Dobbs' Law of Torts* § 117 (July 2022 Update) (explaining that a person who intrudes on another's land without permission, but out of private necessity, is "privileged to enter for such a purpose" and therefore "is under no civil disability that attaches to 'trespassers'"). Because Mr. Whiteru did not choose to be behind the parapet wall, he did not abandon his status as passenger.

In evaluating which standard of care to apply, courts consider the circumstances surrounding a person's entrance into a restricted area. *See, e.g.*, *Daisey*, 331 F.2d at 778 ("[A]ssumptions underlying the minimal duty of care to trespassers at common law may not apply where the premises entered abut on a public way."). A passenger's accidental presence in an area now claimed to be off-limits does not end the common carrier-passenger relationship contemplated by the

26

Restatement and this Court. A common carrier's heightened duty applies when "a passenger is about to fall off a train, *or has fallen*." Restatement (Second) of Torts § 314A, cmt. f (emphasis added).

For example, consider *Frederick*, 10 A.2d 576, the case underlying an illustration in Restatement § 329 on which WMATA and the district court relied. There, the court found voluntariness dispositive, regardless of technical trespass status. *Id.* at 578. When considering "plaintiff's legal status as the result of his accidental fall onto defendant's track," the court concluded: "Since he did not place himself there voluntarily, he was not a trespasser." *Id.* Instead, the controlling issue was the defendant's knowledge of his need for aid: "Even a trespasser, however, is not a pariah. It is true that, unless and until the property owner . . . becomes apprised of his presence, no duty in regard to the trespasser's safety arises, but when the owner or operator is put on guard" as to the trespasser's injured presence, "the latter immediately acquires the right to proper protection under the circumstances." *Id.*

Many of the cases cited by the district court and relied upon by WMATA involve trespassers injured while on rail tracks or in train tunnels. Many of those cases are distinguishable from the Whiterus' because they assert a duty to prevent "original" injuries, not the failure of the carrier to render aid to an already-injured passenger. They are also distinguishable, however, because of the voluntary nature

of the incursion. It is well-established, across over a century of case law, that train tracks and tunnels are off-limits and dangerous to transit riders. *See generally Holland v. Balt. & Oh. R. Co.*, 431 A.2d 597, 603 (D.C. 1981) (explaining that the dangerousness of railroad tracks is so obvious that even a child would realize the risk). A passenger could reasonably be said to terminate her relationship with the carrier by voluntarily entering those areas. However, as the § 314A illustration supports, the same cannot be said of a passenger who accidentally falls off the train and onto those same tracks. Even though the site of the injured person is the same, in one scenario her "trespass" would cut off liability while in the other it would not. That is because it is not the "trespass" that changes the analysis, but whether the plaintiff remained a passenger in a special relationship with the carrier. Here, Mr. Whiteru accidentally fell from the platform WMATA provides to its passengers. That accident did not instantly transform him from a passenger to whom WMATA owed affirmative duties, including a duty to render aid, to a trespasser, owed a much lower duty.

### iv.    Mr. Whiteru's presence behind the wall was foreseeable.

Finally, Mr. Whiteru remained a passenger in a special relationship with WMATA because the location of his need for aid was foreseeable. Foreseeability is central to the determination of the duty owed to an injured plaintiff. *Cf. Daisey*, 331 F.2d at 780 ("[W]hen the trespassers are . . . reasonably expected, the

28

landholder may be required to exercise due care to keep trespassers out, warn them of hazards, or otherwise protect them."). Here, the foreseeability of the injury location supports that the common carrier continued to owe a duty to help the injured person on its property.

Whether a person's presence in an off-limits area was foreseeable is an oft-noted factor in D.C. cases. For example, in *Copeland v. Baltimore & Ohio Railroad Company*, the railroad was not liable for failing to prevent harm to the plaintiff only because the incident occurred in an area in "which the railroad could not have expected to find human activity." 416 A.2d 1, 4 (D.C. 1980). As *Johnson v. WMATA* later explained, *Copeland* focused on whether the plaintiff was "foreseeably endanger[ed]," distinguishing between "isolated" areas and those "where human activity was likely." 764 F. Supp. 1568, 1575 (D.D.C. 1991), *amended*, 773 F. Supp. 459 (D.D.C. 1991), *and amended*, 790 F. Supp. 1174 (D.D.C. 1991). In contrast to the remote location of injury in *Copeland*, *Johnson* observed "[t]here can be little doubt that the Metro Center subway station is the latter sort of area," where much human activity is likely, and so "it was foreseeable that a person would end up on the tracks." *Id.*

Likewise, Mr. Whiteru fell from the passenger platform in the Judiciary Square station to an area where it was equally foreseeable an injured passenger could be located. *See id.* He was standing in an area designed for passenger activity

29

and fell over a low wall at the bottom of an escalator, an area where someone could reasonably be expected to fall[3] (or where other dangers requiring inspection could be, such as a bomb[4]). For that reason, WMATA's policies require the station manager to check such areas every hour and at closing. *Cf. Luck v. Balt. & Oh. R. Co.*, 510 F.2d 663, 667 (D.C. Cir. 1974) (finding the defendant-railroad negligent for "not keeping an adequate lookout" despite having reason to know that there could have been children present in the area of the accident).

As with voluntariness, the foreseeability of Mr. Whiteru's fall from the passenger platform distinguishes him from those who wander onto the tracks, the one place that, across the history of common carrier transit, passengers have not been allowed to go. *See Holland*, 431 A.2d at 603. Nor was he in some remote

---

[3] Indeed, the falls of intoxicated riders in Metro stations are so common that WMATA once released a cautionary highlight reel of "passengers tumbling dozens of feet onto tracks, platforms, and walkways." Scott MacFarlane, *Dangers of Riding Drunk on Metro: New Video Shows Passengers Falling off Escalators, onto Tracks*, NBC Wash. (Dec. 27, 2013), https://www.nbcwashington.com/news/local/dangers-of-riding-drunk-on-metro-new-video-shows-passengers-falling-off-escalators-onto-tracks/1935329.

[4] The Whiterus' expert, Mr. Martin, highlighted that the national standard of care requiring common carriers to look behind walls for objects was endorsed as essential for public safety and security by the Department of Homeland Security after 9/11. JA 504; *see also Tobin v. Penn. R. Co.*, 100 F.2d 435, 437 (D.C. Cir. 1938) ("Railway passenger carriers are bound to use all reasonable precautions against injury of passengers; and these precautions are to be measured by those in known use in the same business, which have been proved by experience to be efficacious.").

location like the plaintiff in *Copeland*. *See* 416 A.2d at 4. Thus, a jury could easily find that Mr. Whiteru's fall was reasonably foreseeable—especially to a long-time WMATA employee such as Ms. Brown. JA 329; *see Johnson*, 764 F. Supp. at 1574–75 (denying WMATA's motion for summary judgment because it should not have been surprising to a reasonable WMATA employee that a person could jump from the platform); *see also Luck*, 510 F.2d at 667 (stating that the D.C. Circuit has "repeatedly recognized" that "landowners owe a duty of reasonable care to child-trespassers whose presence upon the land could be foreseen") (citing to *Smith v. Arbaugh's Rest., Inc.*, 469 F.2d 97, 102 (D.C. Cir. 1972), and *Daisey*, 331 F.2d at 778, two cases that apply this principle to all trespassers, not just children).

Mr. Whiteru "was well within the range of foreseeability in terms of those persons to whom injury might result from [a fall]," and the artificial borders WMATA has now devised cannot be "the outer limits of defendants' vision." *Gould*, 330 F.2d at 830 n.6 ("trespasser's presence is often foreseeable in fact") (citation omitted). Therefore, Mr. Whiteru's fall into a foreseeable location did not terminate his special relationship with WMATA, excusing WMATA of its obligation to inspect and render aid.

Altogether, then, WMATA remained obligated to help Mr. Whiteru even though he fell into the space behind the wall: Section 314A imposes on common carriers the obligation to render aid to known injured passengers. And here, Mr.

31

Whiteru remained a passenger—even though he fell into a place ostensibly not open to the public—because he was a paying customer, remained on WMATA's premises, fell accidentally, and was in a foreseeable location.

## II.   WMATA's duties to Mr. Whiteru did not instantly transform from the highest possible (the special relationship duties) to the lowest possible (the duty owed to a trespasser) when he fell behind the parapet wall.

The district court's analysis, which treated Mr. Whiteru's status after he fell behind the wall as a categorical bar to WMATA's liability, is not required by D.C. precedent and cannot be squared with history, public policy, or common sense. A common carrier's affirmative duty to aid an injured passenger should not depend on the happenstance of whether he falls forward or backward.

### A.   Trespasser status does not categorically terminate a common carrier's affirmative duties.

The district court erred by applying Restatement § 329 with too broad a brush and ignoring the limitation of trespasser status imposed by the § 314A special relationship. The categorical standard for which WMATA argues, and the district court applied, eviscerates the common carrier's heightened duties.

On this record, a categorical application of the trespasser standard of care is illogical and incorrect. A person is deemed a trespasser only if they do not "come[ ] within a recognized exception . . . so as to create a higher standard of care to the trespasser." *Copeland,* 416 A.2d at 3 (addressing the trespasser rule where neither the § 314A nor the common carrier standard was raised by the parties); *see,*

32

*e.g.*, *Daisey*, 331 F.2d at 778 (discussing exceptions). The heightened duty of common carriers is such an exception. *See Whiteru I*, F.4th at 1059. For example, in *Pridgen v. Boston Housing Authority*, the Massachusetts Supreme Judicial Court held that the trial court's jury instructions properly provided that the plaintiff trapped in an elevator was owed affirmative duties "regardless of his initial status as a trespasser." 308 N.E.2d 467, 475–76 (1974). The court observed that this distinct rule applies "*only where* a special relationship exists between the parties, such as common carrier and passenger." *Id.* at 476 (emphasis added).

For this reason, the district court erred in drawing a categorical distinction between the duty owed to trespassers and to passengers. Rather, under D.C. law there is no "distinct line between passengers and non-passengers." *See Whiteru*, 2022 WL 16569295, at *4. There is significantly more nuance to the analysis, based on factors like those considered above. *See Gould*, 330 F.2d at 830. It was improper to treat the question of whether people were typically permitted in the area where Mr. Whiteru fell accidentally as dispositive of whether Mr. Whiteru remained a passenger. Notably, the cases on which WMATA and the district court relied for such a categorical approach did not "implicate or address Section 314A of the Restatement." *See Whiteru I*, 25 F.4th at 1059 (collecting cases).[5] In the few

---

[5] In cases where the common-carrier duty *could have* applied, the court did not address the interaction with trespasser status because the parties failed to raise

cases where the interaction between heightened § 314A duties and the duty owed to trespassers *is* discussed, courts have found the duties of a common carrier prevail. *See, e.g.*, *Winfrey*, 308 P.3d at 904–05 ("The law should not automatically absolve a shopping center owner from taking reasonable action to aid possible or actual customers based on entry into restricted areas."); *Robertson*, 133 So. 2d at 545 (explaining that the heightened duty of a railroad requires it to render aid to passengers even if they have fallen from a train car).

This is particularly true when public transit providers are involved. In *Belton*, this Court agreed that, by traditional standards, the plaintiff could be considered a trespasser, but nonetheless refused to apply that standard of care. 20 F.3d at 1202 ("[W]e doubt whether the *sort of trespass* committed by Belton in leaning against the bus is the type that triggers a laxer standard of care.") (emphasis added). The court explained that the "application of the special standard for trespassers to Belton would seem to unduly complicate ordinary rules relating to use of the public way. Accordingly, we think that despite the trespass plaintiff had only to prove ordinary negligence." *Id.*

As in *Belton*, the unqualified application of the trespasser standard that the district court applied to Mr. Whiteru "unduly complicate[s]" the special

---

it. *See, e.g.*, Pl.'s Mem. Supp. Opp'n to Def.'s Mot. Dismiss, *Coulston*, 2020 WL 1236563.

relationship between WMATA and its passengers. Instead, D.C. courts consider the context when evaluating the carrier's conduct. *Belton,* 20 F.3d at 1202; *see also Harris v. WMATA*, 490 F. Supp. 3d 295, 315–16 (D.D.C. 2020) (considering whether WMATA was liable to an injured "trespasser" when WMATA "h[e]ld their property open to the public" and the injured party "entered the land in response to the invitation"). In the context of this case, Mr. Whiteru did not lose his passenger status by falling backwards instead of forwards while on the train platform. The district court erred by treating the question of whether people were generally allowed in the space where Mr. Whiteru fell as categorically warranting summary judgment.

The district court also erred in stating that "the trespasser issue was not raised or briefed to the Circuit" in *Whiteru I*. JA 804. When this Court previously addressed § 314A's application to this case, it was apparent where Mr. Whiteru's death occurred. WMATA explicitly argued that Mr. Whiteru was in "a place where passengers are not permitted (*trespass*)," Br. of Appellee, *Whiteru v. WMATA*, No. 20-7087, ECF No. 1891917, at 34, (D.C. Cir. Mar. 26, 2021) (emphasis added), that the area behind the parapet wall "is not part of the station platform and is not an area where passengers are permitted to enter or travel through," *id.* at 3, and that WMATA was therefore not required to inspect the "area behind and below elevated station platforms [because] the general public is not permitted to enter

35

[that area]," *id.* at 5. Despite this Court's full awareness of WMATA's express characterization of Mr. Whiteru as a trespasser because he was in a place where he was not permitted, it found that the special relationship between WMATA and Mr. Whiteru continued and that WMATA owed a duty to render him aid if it knew or should have known of his presence. *Whiteru I*, 25 F.4th at 1059. Accordingly, this Court found that because of "the special relationship between common carriers and passengers," WMATA "may not evade liability." *Id.* at 1058.

## B. Categorical application of a trespasser defense to this case contradicts history, public policy, and common sense and is inconsistent with developments in D.C. law.

Considerations of history, public policy, and common sense that typically inform tort law, and that have informed the development of D.C. tort law, all counsel against the district court's binary and categorical treatment of Mr. Whiteru as a trespasser under the circumstances presented here.

### 1. Developments in the law, along with public policy and common sense, all counsel against a categorical trespasser defense.

Over the past century, "the number of exceptions to the no duty to act or to rescue rule based on special relationships has expanded." *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 360 (Tenn. 2008). "[T]he most straightforward of justifications [for this change] is that the nature of the particular relationship creates a sufficiently significant obligation that there is an enforceable expectation

of reasonable action rather than unreasonable indifference." *Id.* In the period

leading up to § 314A's adoption, scholars posited that the economic benefit

principle was central to the common carrier special relationship:

> The carrier obtains economic benefit from the carriage of its passengers
> . . . . Hence the duty to protect them even in situations where they have
> become imperiled through no fault of the carrier, may be regarded as
> the "price" for the benefit conferred. The carrier has voluntarily entered
> into a relationship with such persons, and it cannot complain when
> disadvantageous results attach to that relationship rather than the
> expected advantageous ones.

McNiece & Thornton, *Affirmative Duties in Tort*, *supra*, at 1285. "The

unexpressed assumption" that justified this development was "that the

compensatory nature of the relationship between the person sought to be held

liable and the person injured is such an element of advantage as to justify the

imposition of duties more exacting than those which society normally requires of

its members." *Id.* This policy consideration, codified in § 314A, is consistent with

the special relationship taking precedence over § 329. It is inconsistent with

the district court's categorical application of trespasser status as cutting off the

common carrier's responsibilities.

In the same way, common carriers are "not held to a similar affirmative duty

towards trespassers" with whom they have not entered into relationships. *Id.*

Where a carrier "derives no benefit either actual or potential from the forced

association with [a trespasser], [it] is therefore held to no duty to aid the trespasser

when perils befall him" if the trespasser's injury was due to no fault of the carrier. *Id.* Because Mr. Whiteru paid consideration (and his subsequent injury was worsened by WMATA's neglect), WMATA owed him a common carrier's duty in return.

Likewise, D.C. law has historically acknowledged the "highest degree of care" owed by common carriers and its exceptional nature in tort law:

> No rule is better established than that which holds a common carrier to the highest degree of care toward its passengers for hire and creates liability upon proof of even slight negligence. Neglect in the performance of such duty may be inferred from the occurrence of the accident. The injured party is not relieved from the burden of proving negligence, but the method of proof is rearranged and a prima facie case is established by proof of the accident, injury, and passenger status.

*Missile Cab Ass'n v. Rogers*, 184 A.2d 845, 847 (D.C. 1962) (citations omitted); *see also Birchall v. Cap. Transit Co.*, 34 A.2d 624, 625 (D.C. 1943) ("Out of special solicitude for the safety of human cargo has grown the rule that a common carrier must exercise the highest degree of care in transporting passengers for hire. This means that proof of even slight negligence creates liability on its part.") (citing *Dixon v. Great Falls & O.D. Ry. Co.*, 38 App. D.C. 591 (D.C. Cir. 1912); *Pistorio v. Wash. R. & E. Co.*, 46 App. D.C. 479 (D.C. Cir. 1917); *Cap. Traction Co. v. Copland*, 47 App. D.C. 152 (D.C. Cir. 1917)).

On the other hand, the trespasser standard evolved out of an 18th century understanding of landownership that rarely exists in the modern world. *See*

McNiece & Thornton, *Affirmative Duties in Tort*, *supra*, at 1272; *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959) ("The distinctions which the common law draws between licensee and invitee were inherited from a culture deeply rooted to the land, a culture which traced many of its standards to a heritage of feudalism."). Landowners did not owe trespassers a duty of reasonable care largely because of the "inefficiency of requiring a possessor to protect difficult-to-foresee entrants who could protect themselves at a much lower cost simply by not trespassing." James A. Henderson, Jr., *The Status of Trespassers on Land*, 44 Wake Forest L. Rev. 1071, 1076 (2009). "In an effort to do justice in an industrialized urban society, with its complex economic and individual relationships," modern courts "have found it necessary to formulate increasingly subtle verbal refinements, to create subclassifications among traditional common-law categories, and to delineate fine gradations in the standards of care which the landowner owes to each." *Kermarec*, 358 U.S. at 630. Thus, while the history of the common carrier doctrine reflects increasing acceptance of the carrier's heightened obligations, the history of trespass status reflects increasing *rejection* of categorical applications.

Instead, the evolution of such "refinements" and "subclassifications" in trespasser cases has resulted in a contextual analysis to determine what duty is owed to persons who might otherwise be considered trespassers. For example,

where a person has intruded land out of private necessity, she is treated as having a "privilege" to be there and is "under no civil disability that attaches to 'trespassers.'" Dobbs' Law of Torts, *supra*, § 117; *see, e.g.*, *Rossi v. DelDuca*, 181 N.E.2d 591, 593–94 (Mass. 1962) (plaintiff was on lawn without permission, and was statutorily barred from recovery if trespassing, but because she intruded on lawn out of necessity to avoid physical harm, "the jury could have found that the plaintiff was not a trespasser").

Similarly, the Second Restatement identifies circumstances "where exceptions to the general rule are justifiable as least-cost solutions." Henderson, *Status of Trespassers*, *supra*, at 1076.[6] Holding WMATA to a standard of care that requires it to inspect its premises for members of the public, for instance, is common sense. *See Jeanty*, 718 A.2d at 178 ("[I]t would surely be paradoxical to permit WMATA, which failed to carry out inspections which its own procedures ordained, to obtain judgment in its favor because [the plaintiff] was prevented from proving what the results of any such inspections would have been.").

_____

[6] *See, e.g.*, Ernest J. Weinrib, *The Case for a Duty to Rescue*, 90 Y.L.J. 247, 257 (1980) (explaining that "the common law now imposes a duty on the captain of a vessel to rescue a sailor or passenger who falls overboard," even though "[f]or many years" previously, "the law exonerated the captain who neglected to rescue as long as the need to rescue arose without his fault"; "Recently, however, courts have recognized" the carrier's heightened obligations and imposed an affirmative duty "because of the passenger's necessary dependence on him") (internal citations omitted).

Exceptions to the general rule for trespassers have proliferated to such an extent that the Third Restatement created a new category—"flagrant trespassers"— to more precisely identify the kind of trespasser that should trigger a lower duty. *See generally* Restatement (Third) of Torts, § 52, cmt. a. The Restatement explains that this change was necessary because "[c]ourts have long distinguished among trespassers," including by "impos[ing] special rules for 'frequent trespassers,' 'anticipated trespassers,' 'discovered trespassers,' 'known trespassers,' 'physically trapped,' and 'child' trespassers." *Id.* § 52, Reporter's Note cmt. b (collecting cases) ("Courts and commentators have recognized that the breadth of those falling within the trespasser category might justify different treatment."); *see, e.g.*, *Shelton v. Ky. Easter Seals Soc., Inc.*, 413 S.W.3d 901, 909 n.28 (Ky. 2013) (explaining that the Third Restatement's revised distinction between only "entrants" and "flagrant trespassers" aligns with the Court's "interest in ridding our case law of the often nebulous and inconsistent process of assigning a plaintiff a particular status").

D.C. law has evolved in a similar way: it historically relied on discrete statuses in premises liability cases—*i.e.*, invitees and licensees. *See Firfer*, 208 F.2d at 527–28 (explaining the difference between invitees, licensees by invitation, and bare licensees, or licensees by acquiescence). More recently, D.C., like many jurisdictions, has retreated from the rote application of these discrete statuses,

41

opting for a more holistic analysis. For example, *Firfer*'s proposition that licensees and trespassers are owed the same duty of care is no longer good law. *See Foshee v. Consol. Rail Corp.*, 661 F. Supp. 350, 353 (D.D.C. 1987), *aff'd in part, vacated in part*, 849 F.2d 657 (D.C. Cir. 1988) (stating that D.C. no longer "clings to the *Firfer* rule," and "[t]he appropriate way to measure the duty of a landowner toward those on his land is to determine whether he exercised toward them reasonable care under the circumstances").

This case law and scholarship counsel against an interpretation of Restatement § 329 as automatically cutting off the affirmative duties imposed by § 314A. Yet the district court relied on Illustration 1 of § 329 to reason that Mr. Whiteru was transformed from a passenger to a trespasser when he fell backward rather than forward. *Whiteru*, 2022 WL 16569295, at *4. That application of the Restatement is not supported by case law or logic. First, no rationale was offered for the illustration's conclusion, and the case upon which the illustration is based, *Frederick*, concluded just the opposite: because the injured party "did not place himself there voluntarily, he was *not* a trespasser." 10 A.2d at 578 (emphasis added). Second, nothing in § 329 considers the common-carrier standard outlined in § 314A.

Instead, the district court should have recognized that § 314A takes precedence. For example, as discussed above, Illustration 1 of § 314A (and *Yazoo*,

the case on which it was based) address a situation like this one, where the common carrier was liable for subsequent injuries caused by its failure to provide aid to a known, injured passenger, even though he lay beside the tracks. *Yazoo,* 42 So. 286–88; Restatement (Second) of Torts § 314A, cmt. d, illus. 1. The authority of *Frederick* and the illustration in Restatement § 329 do not justify a categorical application of trespasser status as terminating the common carrier-passenger relationship and the carrier's consequent duties to its passengers.

At bottom, the trespasser standard was created as a "device[] to exclude categories of plaintiffs where the risk was so unforeseeable that the line was drawn on liability." Michael L. Rustad & Thomas H. Koenig, *Taming the Tort Monster*, 68 Brook. L. Rev. 1, 44–45 (2002). On the other hand, special relationships provide courts with means to "make evaluations of risk-creation," and achieve justice "where strict interpretation of the no duty rule is particularly harsh." *Id.* History, public policy, and common sense support that the latter doctrine is more applicable to this case:

> A man's life . . . does not become less worthy of protection by the law nor a loss less worthy of compensation under the law because he has come upon the land of another without permission or with permission but without business purpose. Reasonable people do not ordinarily vary their conduct depending upon such matters, and to focus upon the status of the injured party as a trespasser, licensee, or invitee in order to determine the question whether the landowner has a duty of care, is contrary to our modern social mores and humanitarian values.

*Winfrey*, 308 P.3d at 904 (quoting *Pickard v. City & Cnty. of Honolulu*, 452 P.2d 445, 446 (Haw. 1969)). As the court in *Pridgen* put it, "it is unthinkable" that the law would require a court to exempt a common carrier from liability when it "knowingly refrains from taking reasonable action which [it] is in a position to take and which would prevent injury or further injury to the trespasser." 308 N.E.2d at 476. "It *should* not be, it *cannot* be, and *surely it is not now the law* . . . that the [carrier] in such a situation is rewarded with immunity from liability as long as he ignores the plight of the trapped trespasser and takes no affirmative action to help him." *Id.* (emphases added).

That conclusion is supported by "a recognition by the law of the ever changing concepts of each individual's rights and duties in relation to all other members of our society, and it reflects current standards of concern for the personal safety and well being of each individual." *Id.* Here, considering the law's recognition of evolving social obligations, and the factors that favor prioritizing a common carrier's duties, it is likely that D.C. would apply § 314A rather than categorically treating § 329 as a bar on liability.

## 2. D.C. precedent supports § 314A controlling this case over a categorical application of § 329.

The district court misconstrued D.C. case law in finding that this case is controlled by a binary distinction between passenger status and trespasser status, while ignoring precedent that counsels against such a mechanical application of

WMATA's trespasser defense. As with the D.C. premises liability cases cited above, D.C. cases dealing with the duties owed by common carriers have increasingly imposed affirmative duties on the carriers.

As a general matter, D.C. cases have followed the trend in tort law described above. As early as 1917, the D.C. Court of Appeals emphasized the importance of the special relationships between common carriers and passengers to impose affirmative duties. *Copland*, 47 App. D.C. at 159; *see also Tobin v. Penn. R. Co.*, 100 F.2d 435, 437–38 (D.C. Cir. 1938) (citing *Copland* and stating that a "[carrier] is bound to use the best precautions in known practical use . . . to secure the safety of the passengers") (citations omitted); *Birchall*, 34 A.2d at 625 (citing *Copland* for similar proposition).

This heightened responsibility has shaped the development of D.C. law as it pertains to WMATA and other common carriers, even in cases where the standard is not expressly raised. In 1962, three years prior to the publication of § 314A, *Chvala* held WMATA liable to a non-passenger plaintiff because it was neglectful in maintaining its property. 306 F.2d at 781. That same year, *Daisey* acknowledged special circumstances where trespasser status does not apply. 331 F.2d at 778. In 1974, the D.C. Circuit expanded upon *Daisey* in a railroad negligence case, finding additional circumstances where a railroad owes a heightened duty to categories of foreseeable trespassers. *Luck*, 510 F.2d at 667.

45

In the 1980s and 90s, this trend continued. In *Copeland*, although the court held in favor of the railroad based on trespasser status, it qualified that "the area of the tracks was an area on which the railroad could not have expected to find human activity." *Copeland*, 416 A.2d at 4. Despite its holding (and neither party raising § 314A), the court acknowledged that when "one is on another's land without consent, that person is deemed a trespasser *unless* he or she comes within a recognized exception . . . so as to create a higher standard of care to the trespasser." *Id.* (emphasis added). In *WMATA v. Ward*, the court addressed whether WMATA owed a duty to a person who walked through a restricted area at a Metro station to visit a relative who worked on the premises. 433 A.2d 1072 (D.C. App. 1981). It held that whether the plaintiff was a trespasser was a question for the jury. *Id.* at 1073–74. In *Belton*, decided in 1994, despite the common-carrier standard not being raised by the parties, the court declined to apply the traditional trespasser standard because the injury to the plaintiff was foreseeable. 20 F.3d at 1198–99. These cases show that D.C. recognizes that a common carrier's heightened obligations sometimes trump the general rule that a minimal duty is owed to trespassers.

In two more recent cases, courts applying D.C. law declined to apply heightened common carrier duties because the plaintiffs were merely *prospective* passengers. *See McKethean*, 588 A.2d at 710–11 (holding that no special

relationship existed because the plaintiffs were not yet paying passengers and were not on WMATA property); *Briggs*, 481 F.3d at 845 (finding that the decedent never entered the station or placed himself in the custody of WMATA). By contrast, in *Harris*, another recent case, the federal district court went beyond the approach the Whiterus put forward and found that even an injured person at the entrance of a closed Metro station may have been owed duties under § 314 because he "relied on outward indications that the station was open to the public." 490 F. Supp. 3d at 315–16 ("[L]and possessors who hold their property open to the public do have a duty to provide first aid or summon medical help for injured and ill persons who entered the land in response to the invitation."). Together, these cases show that D.C. law now readily imposes affirmative duties on common carriers, with the operative question being whether the plaintiff was a passenger at the relevant time.

There are now many examples under D.C. law of § 314A requiring affirmative conduct by common carriers. For example, in *WMATA v. O'Neill*, the court applied § 314A to hold a bus driver liable for failing to aid a passenger who was being assaulted. 633 A.2d 834, 840 (D.C. 1993) (holding carrier liable for breaching affirmative duty to aid "despite the entry of another act in the chain of causation"). Similarly, in *Jeanty,* the court applied the common-carrier standard and held that a jury could reasonably find that WMATA had failed to comply with

47

the standard of care governing the inspection of its equipment. 718 A.2d at 178

("[C]ommon carriers 'are bound to exercise extraordinary vigilance [aided] by the

highest skill for the purpose of protecting their passengers against injury resulting

from defects in ways or instrumentalities used by the carriers.'") (quoting *Copland*,

47 App. D.C. at 159).

Certainly, no case mandated the district court's application of § 329 here.

The remainder of the D.C. cases raised by WMATA are unpublished (and thus

have no precedential value, *see* D.C. Rule 28(g)), do not address the

common-carrier standard, or are distinguishable on their facts. Some of those cases

actually support Appellants' argument that WMATA's liability turned on its

constructive knowledge of Mr. Whiteru's need for help. *Whitaker* and *Coulston*

ruled for WMATA on trespasser status, but they emphasized that "it is clear that

there is no justification for a reasonable person to believe that defendant would

consent to the entry of the public into the subway tunnel and onto the tracks."

*Coulston v. WMATA*, No. 19-2060, 2020 WL 1236563, at *2 (D.D.C. Mar. 13,

2020) (quoting *Whitaker*, 1984 U.S. Dist. LEXIS 16712 at *14). Similarly, in

*Hines I*, the court found that the plaintiff's failure-to-warn claim could survive if

WMATA negligently monitored the station. 2022 WL 392306, at *4–5. The

plaintiff did not overcome the trespasser standard only because she failed to allege

who observed, or should have observed, the decedent on the tracks. *Id.* Had it been

established that someone knew or should have known of the plaintiff's peril, the holding of the case would have been different.

Controlling precedent fully supports the principle that Mr. Whiteru remained a passenger in a special relationship with WMATA after he fell, and it does not support the district court's holding that accidental trespasser status instantly and categorically cut off WMATA's obligations.

## III. In the alternative, even if the trespasser defense trumps the § 314A duty to aid, disputes of fact preclude summary judgment.

For all the reasons discussed above, § 314A applies and the trespasser defense—much like contributory negligence—is inapplicable in this case. But, even if this Court finds no error in the district court's legal framework, the district court still erred in granting summary judgment. Even if a trespasser defense is available to WMATA in these circumstances, factual disputes remain regarding whether Mr. Whiteru was a trespasser and whether Ms. Brown was reckless in her failure to inspect despite the requirements of WMATA's policy and national standards.[7]

---

[7] These factual disputes are in addition to those that remain regardless of whether the trespasser defense applies, *i.e.*, (1) whether Ms. Brown negligently failed to inspect the area behind the parapet wall and (2) whether, had she done so, Mr. Whiteru would have been rescued and recovered must be resolved by a jury even if the trespasser defense does not apply.

49

The district court erroneously found that "[t]he parties do not dispute," as a matter of fact, "that the area behind the parapet wall is not typically held open to Metro passengers, the normal divide for when a licensee becomes a trespasser." JA 803. Therefore, according to the district court, the only question was whether Mr. Whiteru's trespasser status precluded his claim as a matter of law. JA 803–807. But whether a plaintiff was trespassing when injured on a defendant's property is well-established as a factual question. *See Ward*, 433 A.2d at 1073 (finding that the plaintiff's evidence "was sufficient to *present to the jury* the question of whether Ward was a trespasser") (emphasis added); *Harris*, 490 F. Supp. 3d at 315–16 (same). The Whiterus have never conceded, and do not concede, that Mr. Whiteru became a trespasser when he accidentally fell into the gap on WMATA's passenger platform, nor do they concede that the parapet wall is "the normal divide for when a licensee becomes a trespasser." *Cf. Trisuzzi v. Tabatchnik*, 666 A.2d 543, 547 (N.J. App. Div. 1995) (*jury question* as to whether plaintiff was a trespasser where jury could conclude he intruded on land out of necessity to avoid dog bite). The facts here are quite distinct from cases where the plaintiff entered the tracks or train tunnel, which are both commonly understood as off-limits and clearly marked as so. *See, e.g.*, *Whitaker*, 1984 U.S. Dist. LEXIS 16712 (trespasser-plaintiff crossed through gate at the end of the platform which

displayed a sign reading, "No Trespassing"). If relevant, it is up to a jury to determine whether Mr. Whiteru was a trespasser. *See id.*

Therefore, the district court erred in granting WMATA summary judgment even if § 329 applied, because there remained genuine disputes as to whether Mr. Whiteru was, in fact, trespassing and whether WMATA breached the duties it still owed to him. Even if this Court affirms the district court's legal analysis of the trespasser defense, it should still reverse and remand for trial on the disputed factual questions.

## Conclusion

For the reasons stated above, the Court should reverse—for the second time—the district court's decision granting WMATA summary judgment and remand the case to proceed to trial.

March 17, 2023          /s/ Andrew D. Levy
                        Andrew D. Levy
                        Andrew D. Freeman
                        Kobie A. Flowers
                        Lauren A. DiMartino
                        Michael R. Abrams
                        Brown, Goldstein & Levy, LLP
                        1300 Eye Street, NW
                        Washington, D.C.  20005
                        Telephone: (202) 742-5969

                        Louis G. Close, III
                        403 Central Avenue

Towson, Maryland 21204
Telephone: (410) 296-3606
*Attorneys for Appellants*

**Certificate of Compliance with Type-Volume Limit, Typeface Requirements, and Type-Style Requirements**

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1), this document contains 12,679 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in 14-point Times New Roman.

/s/ Andrew D. Levy
Andrew D. Levy

*Attorney for Appellants*

53